THE LEHIGH VALLEY RAILROAD COMPANY and THE MORRIS
CANAL AND BANKING COMPANY

*v.*

THE NORTH JERSEY DISTRICT WATER SUPPLY COM-
MISSION et al.

[Submitted June 17th, 1922.   Decided July 26th, 1922.]

1. Evidence *held* to show that the proposed development of a water supply for a city under *P. L. 1916 p. 129*, would divert from the owner and lessee of a canal a substantial part of the waters available to them, with resulting injury to their riparian and charter rights, and would deprive them of the power to keep the canal in sanitary and navigable condition.

2. The storage of water in developing a water supply for a city in such quantities as would leave the owner and lessee without an adequate supply of water, would violate the proviso of section 22 of *P. L. 1916 p. 141*.

3. Where a water supply commission is authorized by law to acquire water rights of canal corporations by agreement or condemnation, they cannot lawfully divert water needed for the operation of the canal without any agreement or condemnation.

4. A court, in supporting the state's policy to provide additional supplies of potable water for the rapidly increasing population of the northern part of this state, cannot disregard rights of property or ignore irreparable injuries to vested rights, or approve conduct necessitating the abandonment of a canal in direct violation of the legislative policy expressed in the act.

On bill, &c.

*Mr. William I. Lewis,* for the complainants.

*Mr. Frank H. Sommer, Mr. Jerome T. Congleton, Mr. Joseph G. Wolber* and *Mr. Spaulding Frazer,* for the defendants.

FOSTER, V. C.

Complainants ask to have defendants restrained from proceeding with the development of a water supply from the

Wanaque river and its tributaries until compensation therefor has first been made to them; and to further restrain defendants from so diverting and impounding such waters in any way or quantity that will interfere with or affect the rights and obligations of complainants as owners and lessees of the Morris canal.

Under the authority granted by chapter 71 of the laws of 1916 (*P. L. 1916 p. 129*), the defendant the North Jersey District Water Supply Commission has entered into a contract with the defendant the city of Newark for the development, by means of a large storage reservoir, of an additional water supply for the city, from the waters of the Wanaque and Greenwood lake and their tributaries—the same sources from which the waters of the Morris canal are in part obtained. Under this contract the reservoir, which is about six miles long and a half mile wide, will have a storage capacity of eleven billion gallons, and it is contemplated to release therefrom daily for the use of the city fifty million gallons or more.

Complainants claim the extent of this diversion is such that it will seriously affect both its rights and obligations and will in effect compel the abandonment of the canal for navigation purposes.

Complainants assert that their status in these proceedings is that of riparian owners—the owners of the bed or banks of the canal—and they also claim not only the ordinary rights incident to such ownership, but also the additional and extraordinary rights to the waters necessary for the canal, granted them in 1824 by the charter of the Morris Canal and Banking Company, and this status is neither denied nor disputed by defendants' pleadings or proofs.

The threatened diversion of waters now flowing into the canal is admitted and the real controversy between the parties can be considered in the following order:

1. Is the extent of the contemplated diversion of the waters now flowing into the canal so great that it will injuriously effect complainants' rights and prevent them from perform-

ing their obligations and duties in maintaining the canal in an operating condition?

2. And are the defendants unlawfully attempting to effect such diversion?

Considering these questions in their order, it appears from the proofs that the canal, which has been held to be a public highway, extends from the Delaware river to the Hudson river, and that the feeders are part of it. *Barnet* v. *Johnson, 15 N. J. Eq. 481; Lehigh Valley Railroad* v. *McFarlan, 31 N. J. Eq. 706; Willink* v. *Morris Canal and Banking Co., 4 N. J. Eq. 377.*

The canal is twenty feet in width at the bottom, forty feet at the top water line, and needs a five-foot depth of water for navigation purposes. Besides the canal and its feeders and tributaries, it has connected with it four hundred and fifty-six structures, including two hundred and eighty-two bridges, forty-three culverts, twelve aqueducts, with flood gates to let out the water when necessary; ten dams, forty-five spillways, thirty-two locks and twenty-four planes and other miscellaneous structures.

By the act of 1871 (*P. L. 1871 p. 445*), under which the canal and banking company leased the canal to the Lehigh Valley Railroad Company, it is provided, in section 3, that the canal company and its lessee may use the surplus water of the canal, or of any of its feeders, not needed for the purposes of navigation in furnishing and supplying the inhabitants of any municipality along the canal with a sufficient quantity of pure and wholesome water for domestic, manufacturing and other uses.

Complainants' proofs show that for the purposes of navigation alone a depth of five feet of water must at all times be maintained in the canal, and in order to keep the canal in such normal navigable condition, additional water must be supplied to meet the requirements of the factors of evaporation, lockage, breakage, individual waste and seepage, and to meet all of these requirements, it is reasonably necessary for them to have, and that there must be available to them at all times, a flow of not less than seventy-seven cubic feet of water

per second into the canal; or, as the engineers term it, and as it will hereafter be referred to, seventy-seven second feet. Of this quantity complainants' proof show that forty-eight second feet is needed for a period of many weeks in dry weather, and that at least forty-one and forty-one hundredths second feet is required in cold, wet weather, merely to keep the canal at the navigating depth of five feet. In this estimated requirement of seventy-seven second feet no allowance has been made for the water required to refill any section of the canal, nor for complainants' rights under the Leasing act of 1871 to sell surplus water.

Defendants' proof is that to keep the level full merely for navigation purposes, requires a flow of only forty second feet, without taking into consideration the water requirements for seepage, lockages, &c.; and to produce this quantity of forty second feet, their engineers find at the head of the Pompton feeder a flow of twenty-seven and thirty-five hundredths second feet, and, as the contract between the defendants provides that there shall be let down daily from their reservoir twelve million gallons, the equivalent of eighteen and fifty-eight hundredths second feet, these two sources produce a total of forty-six and forty-nine hundredths second feet, which defendants claim is an excess of six and forty-nine hundreths second feet, and is that much greater, according to their estimate, than the quantity which is needed by complainants for navigation purposes. Complainants contend defendants' estimate of forty second feet actually produces a shortage of one and fifty-one hundredths second feet in the quantity required merely for navigation at the most favorable season, and that this forty-second-feet estimate also produces a total shortage for all canal purposes, not including the refilling of any section of the canal or the sale of surplus water, of thirty and fifty-one hundredths second feet.

Defendants further claim that they do not intend to affect complainants' supply of water from Greenwood lake, as they contemplate letting the waters stored therein by complainants flow through the reservoir into the Wanaque river, but it is not clear from defendants' proofs if this flowage from

Greenwood lake through the reservoir is to provide the above-mentioned twelve million gallons daily, or if in addition to this quantity complainants will also have the flowage from the lake, nor does it appear when, or how often, or under what conditions the waters from the lake will be permitted to flow through the reservoir into the canal.

From my consideration of the evidence, I am convinced that complainants' engineers, while possibly making extremely careful provision for every contingency, are more accurate in their facts and estimates, than are the engineers and their estimates produced by the defendants. I am influenced in this conviction, not only by the ability and experience of Mr. Vermeule, the chief engineer of complainants, and by the evidence of his assistants, and by their much greater familiarity for years with this territory and its water supply, but also by the fact that it is admitted the twelve million gallons of water which it is proposed to release daily into the canal, or into the streams supplying it, was decided upon by the defendants, without consulting complainants and without particular regard for, or thought of, the requirements of the canal; and because the proofs of the defendants further show that this daily discharge from their reservoir is to be made primarily to prevent any interference with sanitary conditions, or with the rights of riparian owners below the dam. The result of this will be that if the demands for these sanitary purposes and of riparian owners below the dam exhaust this daily discharge, complainants will be left in dry weather with but about one-third of their requirements provided for, or with only twenty-seven and thirty-five hundredths second feet represented by the low flow of the free catchment area of the Pequannock, Ramapo and Wanaque rivers. Notwithstanding this, the defendants contend that the supply of water available for canal purposes after storage in the reservoir begins, will be amply sufficient for all practical purposes, as the canal is in a rundown, dilapidated condition, unsuitable or impossible in many places for navigation, and it is true that in many sections the canal is badly in need of repair and should be cleaned out to its navigating depth, and com-

plainants apparently realize this, for it appears that in 1920 they spent about $170,000 in repairs and maintenance and received no revenue from the operation of the canal, and it also appears that the canal in recent years has been but rarely used for the purpose of navigation by the company or by any of the public, and I am inclined to think these conditions, and the assumption and assertion by defendants that complainants' rights in the canal are merely technical, intangible and unsubstantial, are reflected in the estimate of the canal's requirements stated by defendants' engineers.

But notwithstanding these features of the practical use or non-use of the canal, it does affirmatively appear that defendants intend to divert from complainants a substantial part of the waters now available to them for all canal purposes, with resulting injury to their riparian rights and also to their rights under their charter; and with the further result that complainants will be deprived of the power to perform their duties and obligations of keeping the canal in both a sanitary and navigable condition, for it is admitted by defendants' engineers that the control of the supply of water for canal purposes, in excess of twenty-seven and thirty-five hundredths second feet, will be in the defendant the water supply commission and its operating forces, to determine at any time what quantity of water shall be drawn from the reservoir for the use of the canal. There is no certainty that complainant will receive from the reservoir a daily discharge of twelve million gallons, and if they should not, then they will be left with the flow of but twenty-seven and thirty-five hundredths second feet at the head of the Pompton feeder, and this defendants' engineers admit will be twelve and sixty-five hundredths second feet less than the forty second feet they estimate as the requirements for navigation.

This claim of defendants to control the discharge from the reservoir is in accord with the provisions of section 17 of the act of 1916; it is also, however, under the conclusion I have reached that the quantity of waters to be stored by defendants leaves complainants without an adequate supply for canal

purposes, a violation of the inhibitions of section 22 of the act, which provides:

"That nothing in the act shall authorize any action or agreement that shall operate to abandon or make necessary the abandonment of any canal or waterway, * * * or relieve any canal company or any lessee of any canal from the obligation to maintain and operate said canal."

Defendants by taking from the canal, as they intend doing, nearly two-thirds of its present supply, are clearly violating these inhibitions of the statute, as they thereby make the canal useless and "make necessary its abandonment," in the language of the act, in that by depriving complainants of the means to do so, they relieve them from their obligations to maintain and operate the canal in a sanitary and navigable condition.

This consideration of the statute brings us to the second ground of objection, urged by complainants, viz., that defendants, by their agreement and conduct, are unlawfully engaging in this attempted diversion of water from the canal.

The basis for this objection is that the only power defendants have to acquire water and water rights is derived from the act of 1916, and defendants admit this and claim they are acting under this act and in accordance with its directions.

Section 11 of the act expressly authorizes the water supply commission to acquire by purchase or condemnation any part or all of the water plant, water rights * * * of any existing private corporation or water company. The same section gives the commission further power to construct or cause to be constructed reservoirs, &c.

Section 13 of the act provides that when the commission shall decide to construct any reservoir, which may intercept or interfere with the flow of waters that may be part of the feeder of any canal, or which may be claimed by any canal corporation, the commission is authorized to acquire from such canal corporation the necessary water rights for said reservoir by agreement with said canal corporation, and if it

shall prove impossible to make such agreement, then the commission shall have the right to acquire by condemnation the necessary water flowage or other rights from such canal corporation.

Assuming the powers thus conferred to be broad enough to warrant the condemnation of complainants' riparian rights, it is contended they cannot be exercised to condemn the rights of complainants under their irreparable charter. See *Lehigh Valley Railroad* v. *McFarlan, supra.* It is not necessary for present purposes to determine the merits of this contention, for it is admitted that no attempt has been made by defendants to acquire from complainants any of their rights by agreement, and that resort has not been had to condemnation nor to any other proceeding to acquire the riparian or any other rights of complainants, and no explanation is offered to show why these directions of the statute were not followed.

Acting apparently on the belief that this old water way had too long survived its usefulness, defendants, in violation of the explicit provisions of the act whose protection they now invoke, have undertaken to deprive complainants of valuable property rights, and by their actions, if consummated, they will permit complainants to evade or escape the performance of the duties and obligations which they owe the public to maintain and operate the canal.

In justification for this conduct, it is pleaded that the act of 1916, and action taken under it by the water supply commission, is a proper exercise of the police power, and this is not seriously disputed. The criticism made against the defendants is not that they have exercised the powers given them by the act; it is that they have failed or neglected to exercise such powers in the manner the act prescribes, or in any manner authorized by any law.

Further justification for defendants' conduct is sought in the claim that the state has in this act adopted a definite policy to provide additional supplies of potable waters for the constantly and rapidly increasing population of the northern

part of the state, and it is urged that this policy should receive the support of the courts.

That such support will always be granted by the courts to any such beneficent policy of conservation it seems unnecessary to state, but such support does not require the court to disregard all rights of property, or to ignore irreparable injury to vested rights, or to approved conduct which is directly violative of such legislative policy.

That the legislature had this canal and this canal property in mind when this statute was enacted is apparent from a reading of sections 11, 13 and 22; and it is further apparent therefrom that while the legislature intended to treat the canal company fairly and made provision to compensate it by agreement or condemnation, for any of its rights acquired, or injured as a result of its enforcement, it is likewise apparent, that it was also intended that neither the policy which it thereby adopted nor the exercise of any of the powers which the statute conferred, could or should be used in any way to permit complainants to abandon the canal, or to escape or be relieved from the duty and obligation resting on them for its proper maintenance and operation.

It is not the province of the court to substitute its own course of procedure for that prescribed by the legislature, nor should the court approve a procedure substantially different from that prescribed, particularly where such substituted procedure has produced or is certain to produce the very injury to private property and rights which the legislative enactment was clearly and expressly designed to prevent. As the conduct of the defendants, as well as the agreement between them, admittedly contemplate diverting waters from the canal which are reasonably necessary for its maintenance and operation, and as this purpose if permitted to be consummated will result in irreparable loss and injury to complainants, and will be in direct violation of the provisions of the act of 1916, in that no agreement or proceedings have been or are contemplated to be made or taken by defendants to compensate complainants for any such loss or injury, a case is presented for the exercise of equitable jurisdiction to pre-

vent this threatened injury. *Wolcott* v. *Melick, 11 N. J. Eq. 204; Sayre* v. *Newark, 58 N. J. Eq. 148; Paterson* v. *East Jersey Water Co., 74 N. J. Eq. 49.*

And I will advise that the restraint prayed for be granted. The terms of the decree can be settled on notice.